UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

NY CITIZENS AUDIT CIVIC FUND, INC., *et al.*,

        **Plaintiffs,**

  vs.              **1:25-CV-1447**
                 **(MAD/MJK)**

LETITIA JAMES, *et al.*,

        **Defendants.**

---

APPEARANCES:       OF COUNSEL:

**JOHN L. O'KELLY**      **JOHN L. O'KELLY, ESQ.**
339 Richard Avenue
Hicksville, New York 11801
Attorney for Plaintiffs

**OFFICE OF THE NEW YORK**   **BENJAMIN L. LOEFKE, AAG**
**STATE ATTORNEY GENERAL**
The Capitol
Albany, New York 12224
Attorney for Defendants

**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I. INTRODUCTION

This action, which concerns a private organization's investigation of New York's voter rolls and the conduct of state actors in the New York Attorney General's Office ("AG's Office") and New York State Board of Elections ("BOE"), commenced on October 16, 2025. *See* Dkt. No. 1. There are eight Plaintiffs in this action: NY Citizens Audit Civic Fund, Inc. ("NYCA"), which identifies itself as a nonprofit organization that provides research and education on election validity and voting rights; Marly Hornik, a New York voter and NYCA's Executive Director;

1

New York voters and NYCA volunteers Karen Ambrosetti, Patrick Wynn, Randall Barber, Joe Atkinson,[1] and Susan Herrington; and Diane Sare, a New York voter and former United States Senate candidate. *See id.* There are fourteen Defendants: New York Attorney General Letitia James in her official and individual capacities; AG's Office employees Lindsay McKenzie and Rick Sawyer in their official and individual capacities; the BOE itself; BOE Co-Executive Director Kristen Zebrowski Stavisky in her official and individual capacities; BOE employees Raymond J. Riley III, Brian Quail, Kathleen McGrath, Jennifer Wilson, Peter S. Kosinski, Douglas A. Kellner, Anthony Casale, and Andrew J. Spano, in their official and individual capacities; and BOE Co-Chair Henry T. Berger in his official capacity only.[2] *See id.* All parties are represented by counsel.

The fifty-two-page complaint lists seven claims: (1) a First Amendment free speech violation; (2) a First Amendment right-to-petition violation; (3) voter intimidation in violation of 52 U.S.C. § 10101(b), which is part of the Voting Rights Act of 1965 ("Voting Rights Act"); (4) state law defamation; (5) a Fourteenth Amendment due process violation; (6) a Fifth Amendment due process violation; and (7) a violation of the right to a legitimate representative government under the federal Constitution's Composition Clause. *See id.* at ¶¶ 77-112. The complaint also contains a section marked "Remediation of Uncontested Claims," which appears to set forth additional factual allegations. *See id.* at ¶¶ 113-18. Plaintiffs seek a judgment declaring Defendants' actions unlawful and enjoining a vast array of conduct in future elections. *See id.* at

---

[1] Plaintiff Atkinson is also referred to as "Joseph Atkinson" in the complaint. Dkt. No. 1 at ¶ 17.

[2] These Defendants are listed on the docket and in the case caption on the complaint. *See* Dkt. No. 1 at 1. Elsewhere, the complaint lists someone named Essma Bagnuola as a Defendant "in her official capacity as Commissioner of the [BOE.]" *Id.* at ¶ 18. Because Bagnuola is not mentioned in the case caption, on the docket, or in the parties' briefing, and Plaintiffs have not moved to amend the caption or docket, the Court assumes that Bagnuola's inclusion in the complaint was inadvertent.

47-50.  Finally, Plaintiffs ask the Court to order Defendants "to establish a plan for securing and regularly updating the voter rolls to comply with federal law," mandate the AG's Office and BOE to send retraction letters regarding their disparagement of NYCA's work, and require the BOE to provide documents in response to a 2023 Freedom of Information Law ("FOIL") request by a nonparty individual.  *See id.* at 51.

On December 23, 2025, Defendants moved to dismiss the complaint.  *See* Dkt. No. 15. Plaintiffs opposed the motion on January 13, 2026, *see* Dkt. No. 17, and refiled the opposition with an exhibit on January 15, 2026, *see* Dkt. No. 18.  Plaintiffs then filed an affidavit in opposition to the motion on January 20, 2026.  *See* Dkt. No. 19.  Defendants filed a reply that same day.  *See* Dkt. No. 20.  For the following reasons, Defendants' motion is granted in part and denied in part.

## II. BACKGROUND

The following summary is derived from Plaintiff's complaint and its thirty-two attached exhibits.  *See* Dkt. No. 1.

In October 2021, after filing a FOIL request, NYCA volunteers allegedly began auditing a copy of New York's statewide voter registration list (identified in the complaint as "NYSVoter"). *See id.* at ¶ 19.  The auditors compared the list with the "certified 2020 election results, as reported on the [BOE] website[,]" and allegedly discovered "[s]ignificant anomalies[.]"  *Id.* at ¶ 21.  NYCA reported its findings to the BOE and AG's Office on May 9, 2022, "in the form of a Petition for Redress of Grievances[.]"  *See id.*  Plaintiffs allege that more than 5,000 New York voters signed the petition, which demanded a response within thirty days.  *See id.*  According to Plaintiffs, the anomalies included a mismatch between the 2020 general election official vote count and "the number of voters who voted in the New York State voter rolls," as well as

discrepancies in the number of registered New York voters. *See id.* Plaintiffs claim that"[t]he anomalies called into uncertainty the legitimacy of the 2020 general election results[.]" *Id.* NYCA did not receive a response to its petition. *See id.* at ¶ 22. During the summer of 2022, NYCA volunteers allegedly presented their petition to eighteen county legislatures. *See id.* at ¶ 26.

In addition to the petition, Plaintiffs allege that NYCA performed "[a] study of algorithms discovered within the [NYSVoter] database structure[.]" *Id.* at ¶ 23. The study, which is attached to the complaint as an exhibit, claimed to reveal "strong evidence" that New York voters' identification numbers had been manipulated. *See* Dkt. No. 1-1. Plaintiffs allege that this finding was reported to the New York State Police, the Federal Bureau of Investigation, and the New York State Legislature. *See* Dkt. No. 1 at ¶ 24. According to Plaintiffs, no agency took any action in response to the study. *See id.*

Plaintiffs allege that on November 8, 2022, the BOE administered and certified numerous elections using a potentially compromised system. *See id.* at ¶ 25. On December 15, 2022, NYCA conducted another NYSVoter audit. *See id.* at ¶ 27. The following month, NYCA drafted a "Resolution for an End-to-End Audit of New York's 2022 General Election" (the "Resolution"). *Id.* at ¶ 28. According to Plaintiffs, the Resolution exposed invalid voter registrations and hundreds of thousands of illegal votes in the 2022 general election. *See id.* at ¶ 30. Starting in February 2023, NYCA volunteers allegedly presented the Resolution to hundreds of town boards and numerous county legislatures. *See id.* at ¶ 29.

From "late 2022 into 2023[,]" NYCA volunteers canvassed voters whose records allegedly appeared to be corrupted in NYSVoter. *Id.* at ¶ 38. According to Plaintiffs, volunteers approached voters and asked them whether their NYSVoter records were correct. *See id.* They

contend that they were trying to "determine whether there could be an innocent explanation for the volumes of allegedly invalid or illegal data in NYSVoter." *Id.* at ¶ 40.  NYCA also allegedly commenced a separate study regarding duplicative voter records.  *See id.*  Plaintiffs emphasize that they never accused individual voters of fraud.  *See id.* at ¶ 42.  They allege that NYCA volunteers submitted more than 800 FOIL requests to county boards of elections, which revealed voter signature discrepancies.  *See id.* at ¶ 43.  A volunteer also allegedly submitted two FOIL requests for the NYSVoter audit logs, which Plaintiffs claim were denied.  *See id.* at ¶ 44; *see also* Dkt. No. 1-24.

On April 5, 2023, the BOE allegedly sent a letter to election officials statewide regarding NYCA's presentations.  *See* Dkt. No. 1 at ¶ 32.  According to Plaintiffs, the letter accused them of spreading misinformation.  *See id.*  They allege that the letter was accompanied by a document titled "False Claims Explained[,]" which "officials and representatives statewide [used] to preemptively discredit and dismiss NYCA volunteers and reports."  *Id.* at ¶ 37.  Plaintiffs characterize the BOE's actions as "flagrantly ignor[ing] the concerns of over 5,000 New York citizen voters" and "smearing them in front of their own representatives."  *Id.* at ¶ 34.

On August 13, 2023, Plaintiffs submitted a "comprehensive report of the 2022 general election in New York" to the BOE's Division of Election Law Enforcement.  *Id.* at ¶ 46.  According to Plaintiffs, a public version of the report is available under the title "New York's 2022 General Election: The Reign of Error."  *Id.* at ¶ 47.  The report "requested an official acknowledgment of receipt" from the BOE within ten days.  *Id.* at ¶ 48.  On August 31, 2023, the BOE issued a press release "warning of 'election imposters' visiting homes and intimidating voters[,]" which was discussed in the news media and on county election websites.  *Id.* at ¶ 49.

Plaintiffs allege that on September 6, 2023, during a public BOE meeting, attendees discussed the Reign of Error report. *See id.* at ¶ 50. Plaintiffs contend that, even though no one at the meeting had reviewed the data underlying the report, BOE officials disparaged NYCA's claims as "false and malicious[.]" *Id.*

On September 21, 2023, NYCA learned that the AG's Office issued a cease-and-desist letter regarding NYCA's canvassing efforts. *See id.* at ¶ 51. Plaintiffs allege that they discovered the letter through the news media, which suggests it was "leaked." *Id.* NYCA responded with a press release of its own, wherein Plaintiff Hornik defended NYCA's actions. *See id.* at ¶ 53. Plaintiffs allege that Defendant James then "publicly escalated the Cease and Desist to a criminal investigation for alleged conspiratorial violations of the 'Ku Klux Klan Act[.]'" *Id.* at ¶ 54. According to the complaint, the investigation was active for eleven months and "involv[ed] multiple subpoenas and deficiency letters designed to shut up and shut down NYCA." *Id.* at ¶ 65. Plaintiffs allege that the investigation left NYCA "totally humiliated, financially exhausted, and defamed statewide and nationally[.]" *Id.* It also allegedly lost more than a thousand volunteers, who "left NYCA in fear." *Id.* at ¶ 66.

In October 2023, BOE officials released written statements that allegedly defamed NYCA. *See id.* at ¶¶ 55-56. According to the complaint, these statements reiterated the BOE's stance that Plaintiffs were maliciously spreading misinformation and impersonating BOE employees. *See id.* Plaintiffs allege that the BOE defamed them again in another letter dated November 28, 2023, by calling NYCA's reports "embellished and misleading[.]" *Id.* at ¶ 59.

Plaintiffs ultimately aver that Defendants "conspired to use an attack campaign statewide alleging criminal behavior in order to intimidate and silence voters working together as NYCA to verify and report on election crimes, effectively crushing NYCA." *Id.* at ¶ 68.

6

### III. DISCUSSION

**A.      Standard of Review**

"[A] federal court generally may not rule on the merits of a case without first determining that it has jurisdiction over the category of claim in suit (subject-matter jurisdiction)." *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 430-31 (2007) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 93-102 (1998)); *see Lyndonville Sav. Bank & Tr. Co. v. Lussier*, 211 F.3d 697, 700-01 (2d Cir. 2000). "A case is properly dismissed for lack of subject matter jurisdiction under [Federal Rule of Civil Procedure] 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000) (citation omitted).

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the "legal sufficiency" of the pleader's claim for relief. *Patane v. Clark*, 508 F.3d 106, 111-12 (2d Cir. 2007) (citation omitted). Although a court's review of a motion to dismiss is generally limited to the facts presented in the pleading, courts may still consider documents attached to the pleading as an exhibit or incorporated by reference into the pleading. *See Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002)). Courts must accept as true all well-pleaded facts in the pleading and draw all reasonable inferences in the pleader's favor. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (citation omitted). This presumption of truth does not extend to legal conclusions. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).

To survive a motion to dismiss, a party need only plead "a short and plain statement of the claim[,]" *see* FED. R. CIV. P. 8(a)(2), with sufficient factual "heft to 'sho[w] that the pleader is entitled to relief[,]'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007). Under this standard,

the pleading's "[f]actual allegations must be enough to raise a right to relief above the speculative level," *id.* at 555 (citation omitted), and present claims that are "plausible on [their] face," *id.* at 570.

**B.    Sovereign Immunity**

Preliminarily, Defendants argue that some of Plaintiffs' complaint is barred by sovereign immunity under the Eleventh Amendment. *See* Dkt. No. 15-1 at 7. They contend that, "[t]o the extent that Plaintiffs' complaint is read to seek either monetary or injunctive relief compelling the State officials to comply with State law, . . . that relief must be dismissed." *Id.* In opposition, Plaintiffs make arguments about clearly established constitutional rights. *See* Dkt. No. 18 at ¶¶ 4, 18. They also contend that Defendants, despite working for the New York State AG's Office and BOE, are "congressional officials subject to federal jurisdiction and enforcement." *Id.* at ¶ 20. Finally, Plaintiffs argue that they are not asking the Court to force Defendants to comply with state law. *See id.*

"The Eleventh Amendment to the United States Constitution bars federal courts from exercising subject matter jurisdiction over claims against a state or one of its agencies absent their consent to such a suit or an express statutory waiver of immunity." *Kilcher v. N.Y. State Police*, No. 1:19-CV-157, 2019 WL 2511154, *3 (N.D.N.Y. June 18, 2019) (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 90-100 (1984)). "When a plaintiff sues a state official, Eleventh Amendment immunity depends on whether the suit is essentially against the state itself." *Dan v. Hochul*, No. 1:25-CV-122, 2025 WL 2818680, *5 (N.D.N.Y. Oct. 2, 2025) (citing *Pennhurst State Sch. & Hosp.*, 465 U.S. at 101). State officers sued in their official capacities are eligible for sovereign immunity, *see Jemzura v. Pub. Serv. Comm'n*, 961 F. Supp. 406, 412

(N.D.N.Y. 1997), as is the BOE, *see Murawski v. N.Y. State Bd. of Elections*, 285 F. Supp. 3d 691, 695-96 (S.D.N.Y. 2018).

### 1. *Claims One Through Seven*

Defendants have not waived immunity or consented to suit as to the constitutional claims, nor has Congress abrogated their sovereign immunity. *See Goonewardena v. New York*, 475 F. Supp. 2d 310, 329 (S.D.N.Y. 2007) (noting that the State of New York and its officers, sued in their official capacities, have Eleventh Amendment immunity from § 1983 claims); *Morris v. N.Y. State Police*, 268 F. Supp. 3d 342, 359 (N.D.N.Y. 2017) (noting that Congress has not abrogated New York's sovereign immunity from § 1983 claims). Defendants therefore have Eleventh Amendment immunity on claims one, two, five, six, and seven in their official capacities.

"Further, the State of New York has not consented to be sued in federal court for, and Congress has not validly abrogated state sovereign immunity from, claims arising under state common law." *Morris*, 268 F. Supp. 3d at 360 (citation and internal quotation marks omitted). Because defamation is one such state law claim, Defendants have sovereign immunity on claim four as to their official capacities. *See id.* at 360, 369.

Conversely, Defendants are not immune under claim three because Congress abrogated sovereign immunity for claims under the Voting Rights Act. *See Dekom v. New York*, No. 12-CV-1318, 2013 WL 3095010, *10 (E.D.N.Y. June 18, 2013), *aff'd*, 583 Fed. Appx. 15 (2d Cir. 2014) (summary order).

Accordingly, Plaintiffs' first, second, fourth, fifth, sixth, and seventh claims will be evaluated against Defendants in their individual capacities only. The Court will evaluate Plaintiffs' third claim against Defendants in both their official and individual capacities. Because "sovereign immunity implicates jurisdictional concerns[,]" *Hale v. Mann*, 219 F.3d 61, 67 (2d Cir.

2000) (citing *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 72-73 (1996); *Pennhurst State Sch. & Hosp.*, 465 U.S. at 100), the Court dismisses the barred official-capacity claims without prejudice, *see Canfield v. New York*, No. 6:24-CV-1357, 2025 WL 1288747, *2-3 (N.D.N.Y. May 5, 2025); *Karupaiyan v. New York*, No. 23-CV-1257, 2024 WL 2174272, *2 (2d Cir. May 15, 2024) (summary order).

### 2. *Claims for Injunctive and Declaratory Relief*

Turning to Plaintiffs' claims for injunctive and declaratory relief, the narrow *Ex Parte Young* exception to sovereign immunity "'allows a suit for injunctive [or declaratory] relief challenging the constitutionality of a state official's actions in enforcing state law.'" *Anghel v. N.Y. State Dep't of Health*, 947 F. Supp. 2d 284, 298 (E.D.N.Y. 2013) (quoting *CSX Transp., Inc. v. N.Y. State Off. of Real Prop. Servs.*, 306 F.3d 87, 98 (2d Cir. 2002)); *see Dan*, 2025 WL 2818680, at *5. Defendants argue that the exception does not apply, *see* Dkt. No. 15-1 at 7, while Plaintiffs appear to argue that it does, *see* Dkt. No. 18 at ¶ 20. To determine the applicability of *Ex Parte Young*, courts "'conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" *CSX Transp., Inc.*, 306 F.3d at 98 (quoting *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002)). While that analysis does not include an evaluation of a claim's merits, the plaintiff "must still sufficiently plead 'plausible and nonconclusory factual allegations' to support application of the exception." *Dan*, 2025 WL 2818680, at *5 (quoting *Kelsey v. Kessel*, No. 24-1105, 2025 WL 1324213, *1 (2d Cir. May 7, 2025)).

Plaintiffs' complaint contains a long list of injunctive and declaratory relief sought. *See* Dkt. No. 1 at 47-51. Critically, however, *Ex Parte Young* "does not permit judgments against state officers declaring that they violated federal law in the past[.]" *Puerto Rico Aqueduct &*

10

*Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993).  Thus, to the extent that Plaintiffs ask the Court to declare retroactively that Defendants violated federal law, the Court declines to do so.  *See* Dkt. No. 1 at 47-49; *see also T.W. v. N.Y. State Bd. of L. Exam'rs*, 110 F.4th 71, 91-92 (2d Cir. 2024).

As for Plaintiffs' remaining requests for equitable relief, the alleged wrongdoings do not constitute ongoing violations of federal law.  The complaint, which was filed in October 2025, outlines Defendants' alleged conduct from 2021 to 2023.  *See* Dkt. No. 1.  As detailed above, the complaint alleges discrete incidents that occurred years before the commencement of this action.  *See id.*  The Court cannot discern any allegation that Defendants' failure to respond to Plaintiffs' petition and studies or their dissemination of letters criticizing Plaintiffs' actions are ongoing.

The counseled complaint broadly and speculatively forecasts that recurrent "election problems . . . will continue to plague New York" in future federal and state races.  *Id.* at ¶ 71.  A plaintiff can plead an ongoing violation of federal law "by alleging 'that he plans to engage in actions in the future' that will subject him to further misconduct from the defendant[,]" *Dan*, 2025 WL 2818680, at *6 (quoting *Kelsey*, 2025 WL 1324213, at *2), but again, those allegations must be "'plausible and nonconclusory[,]'" *id.* at *5 (quoting *Kelsey*, 2025 WL 1324213, at *1).  Some of Plaintiffs' claims for injunctive relief ask the Court to enjoin certain conduct in future elections, *see* Dkt. No. 1 at 49-51, but beyond the complaint's conclusory anticipation of recurrent "election problems[,]" Plaintiffs do not concretely allege that they will engage in future conduct subjecting them to further harm by Defendants, *id.* at ¶ 71.  Thus, the Court finds that *Ex Parte Young* does not apply, and Plaintiffs' claims for injunctive and declaratory relief are barred by the Eleventh Amendment.

**C.      First Amendment Claims (Claims One and Two)**

Defendants regard claims one and two—the First Amendment free speech and freedom-of-petition claims—as retaliation claims. *See* Dkt. No. 15-1 at 8. Plaintiffs do not object to that characterization, and their opposition papers argue that they sufficiently allege retaliation. *See* Dkt. No. 18 at ¶¶ 29-32. Because Plaintiffs claim that Defendants acted unlawfully in response to Plaintiffs' protected speech and conduct, the Court proceeds under a First Amendment retaliation framework.

The Second Circuit has "described the elements of a First Amendment retaliation claim in several ways, depending on the factual context." *Williams v. Town of Greenburgh*, 535 F.3d 71, 76 (2d Cir. 2008) (citations omitted). Where a private plaintiff sues public officials, the Second Circuit states the elements as follows: "'(1) [Plaintiffs] [have] a right protected by the First Amendment; (2) [Defendants'] actions were motivated or substantially caused by [Plaintiffs'] exercise of that right; and (3) [Defendants'] actions caused [Plaintiffs] some injury.'" *Decker Advert. Inc. v. Delaware Cnty.*, 765 F. Supp. 3d 128, 148-49 (N.D.N.Y. 2025) (quoting *Dorsett v. Cnty. of Nassau*, 732 F.3d 157, 160 (2d Cir. 2013)).

Although Defendants do not challenge the first element, they argue that Plaintiffs fail to plead the second and third elements. *See* Dkt. No. 15-1 at 9. Plaintiffs argue that the complaint amply alleges causation and injury through NYCA's loss of volunteers, the prospect of criminal charges against NYCA members, and Defendants' attacks on Plaintiffs' credibility. *See* Dkt. No. 18 at ¶ 29.

### 1. *Causation*

A plaintiff must plead facts suggesting that retaliatory motive was a "but-for" cause of the challenged actions, which "'mean[s] that the adverse action against the plaintiff would not have been taken absent the retaliatory motive.'" *Winnie v. Sinagra*, No. 1:24-CV-940, 2025 WL

12

2391723, *3 (N.D.N.Y. Aug. 18, 2025) (quoting *Nieves v. Bartlett*, 587 U.S. 391, 399 (2019)).

"Recognizing that a defendant's motive and intent are difficult to plead with specificity, courts in

this Circuit find that 'it is sufficient to allege facts from which a retaliatory intent reasonably may

be inferred.'" *Decker Advert. Inc.*, 765 F. Supp. 3d at 150 (quoting *Gagliardi v. Vill. of Pawling*,

18 F.3d 188, 195 (2d Cir. 1994)).  This threshold is not high, and a plaintiff can meet it by

alleging "circumstantial facts" supporting an inference of retaliatory intent.  *Id.*

Temporal proximity between the protected activity and the alleged retaliation may be

sufficient at the pleading stage.  *See id.*  Although the Second Circuit has not expressly limited

how long the temporal gap can be, it has "'generally held that causation can only be inferred after

the passage of a few weeks or months[.]"  *D'Andrea v. Nielsen*, 765 Fed. Appx. 602, 605 (2d Cir.

2019) (summary order) (quoting *Gorman-Bakos v. Cornell Coop. Extension of Schenectady Cnty.*,

252 F.3d 545, 554 (2d Cir. 2001)).  "[A] delay of more than a year is fatal to a showing of

causation[.]"  *Id.* (citing *Cortes v. M.T.A. N.Y.C. Transit*, 802 F.3d 226, 233 (2d Cir. 2015);

*Burkybile v. Bd. of Educ. of the Hastings-on-Hudson Union Free Sch. Dist.*, 411 F.3d 306, 314

(2d Cir. 2005)).

Plaintiffs appear to rely on temporal proximity between their actions and Defendants'

alleged retaliation, even though the complaint does not explicitly say so.  *See* Dkt. No. 1; Dkt. No.

18 at ¶ 29.  Despite the absence of an explicit allegation that temporal proximity establishes

causation, "a court must 'exercise its judgment about the permissible inferences that can be drawn

from temporal proximity in the context of particular cases[.]"  *Medina v. AAM 15 Mgmt. LLC*,

750 F. Supp. 3d 332, 353 (S.D.N.Y. 2024) (quoting *Summa v. Hofstra Univ.*, 708 F.3d 115, 128

(2d Cir. 2013)); *see also Crider v. McGrath*, No. 9:25-CV-629, 2026 WL 550006, *11-12

(N.D.N.Y. Feb. 27, 2026).  The complaint alleges the following retaliatory conduct: (1) the BOE's

letter dated April 5, 2023, regarding NYCA's presentations; (2) the BOE's August 31, 2023, press release regarding NYCA's canvassing efforts; (3) the AG's Office's September 21, 2023, cease-and-desist letter in response to the canvassing efforts; (4) the AG's Office's eleven-month investigation that began "in the ensuing weeks" after the cease-and-desist letter; and (5) defamatory written statements by BOE officials in October and November 2023. *See* Dkt. No. 1 at ¶¶ 32, 49, 51, 54-55, 59; Dkt. No. 1-20.

The complaint alleges that NYCA began its canvassing initiative in "late 2022 into 2023[.]" Dkt. No. 1 at ¶ 38. Likewise, NYCA allegedly began presenting its Resolution to town boards and county legislatures in February 2023, approximately two months before the BOE's first letter. *See id.* at ¶ 29. Also, the BOE's August 2023 press release came less than a year after the canvassing efforts began, followed closely by the AG's Office's cease-and-desist letter and commencement of the investigation. *See id.* at ¶¶ 49, 51, 54. The October and November 2023 letters, which discussed NYCA's interactions with voters and the group's spreading of "fabricated" and "malicious" claims to various legislative bodies, were issued within the same calendar year as NYCA's conduct (with the exception of the earliest canvassing efforts at the end of 2022). Dkt. Nos. 1-21, 1-23; *see* Dkt. No. 1 at ¶¶ 55-56, 59. Based on timing, and without a strict number of months under the one-year cutoff that can support causation through temporal proximity, the complaint raises at least some inference of retaliatory intent.

Furthermore, Plaintiffs allege that, at a September 6, 2023, BOE meeting, Defendant Stavisky said the BOE was "on the offensive now" in response to Plaintiffs' activities. *See* Dkt. No. 1 at ¶ 50; Dkt. No. 1-19 at 12. This remark, by its nature, supports some inference of retaliatory motive and but-for causation.

Considering the four corners of the complaint and its attached exhibits, and without assessing the weight of any evidence or making credibility determinations, the Court finds that Plaintiffs plausibly allege causation.

### 2.  *Chilling Effect or Other Harm*

The Court now considers whether Plaintiffs adequately allege a chilling effect on their speech or some other harm sufficient to satisfy the pleading standard.  On the third retaliation element, a plaintiff must allege "'either that [its] speech has been adversely affected by the government retaliation or that [it has] suffered some other concrete harm.'"  *Decker Advert. Inc.*, 765 F. Supp. 3d at 150 (quoting *Dorsett*, 732 F.3d at 160).  When relying on allegations that a defendant's conduct chilled its speech, a plaintiff "must allege that [its] First Amendment rights were *actually* chilled."  *Walker v. Rosa*, No. 1:24-CV-1171, 2025 WL 3287025, *9 (N.D.N.Y. Oct. 29, 2025), *R. & R. adopted*, 2025 WL 3282707 (N.D.N.Y. Nov. 25, 2025) (citation and internal quotation marks omitted) (emphasis added).  "Allegations of a subjective chill are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm."  *Id.* (citation and internal quotation marks omitted).  However, even in the absence of properly pled "chilling effect" allegations, "other forms of tangible harm will satisfy the injury requirement[.]"  *Id.*

Defendants argue that the First Amendment claims must fail because Plaintiffs allege "only a subjective chill, not an objectively reasonable one[,]" and continued "mak[ing] public accusations" and "issu[ing] press releases" after the cease-and-desist letter was sent.  Dkt. No. 15-1 at 9-10.  Defendants also contend that the complaint alleges no "other concrete harm beyond a chilling effect."  *Id.* at 10.  Plaintiffs argue that Defendants' actions caused harm by scaring away

volunteers and causing NYCA to drain its funds, leaving the organization "broke and with few volunteers[.]"  *See* Dkt. No. 18 at ¶¶ 11, 31.

The Court acknowledges Defendants' argument that Plaintiffs' continued issuance of press releases and new studies undermines its claim of chilled speech.  However, the complaint alleges separate concrete harm through financial exhaustion and an exodus of volunteers, which essentially shut down NYCA.  *See* Dkt. No. 1 at ¶¶ 65-66, 68.  At the pleading stage, allegations that the defendant's actions harmed the plaintiff's ability to continue its operations are sufficient to satisfy the third element.  *See New Page at 63 Main, LLC v. Inc. Vill. of Sag Harbor*, No. 15-CV-2433, 2016 WL 8653493, *9 (E.D.N.Y. Mar. 19, 2016) ("Here, the [p]laintiffs do allege harm in the form of . . . the revocation of their license for outdoor seating, which they contend was vital to their business . . ."); *cf. Maco v. Baldwin Union Free Sch. Dist.*, 249 F. Supp. 3d 674, 679-80 (E.D.N.Y. 2017) (finding the injury element unsatisfied at a later stage of litigation because the plaintiff failed to show harm to her business after the defendant reported her to child protective services).  Thus, based on the contents of the complaint and drawing all reasonable inferences in Plaintiffs' favor, the Court finds that Plaintiffs have plausibly alleged concrete harm.

Accordingly, Defendants' motion is denied as to claims one and two of the complaint.

**D.    Voter Intimidation Claim (Claim Three)**

Claim three of the complaint accuses Defendants of violating the Voting Rights Act by "deliberately and knowingly conspiring to defame and suppress Plaintiffs' right to vote[.]"[3]  Dkt. No. 1 at ¶ 89.  Plaintiffs claim that Defendants violated the statute by working "to defame and malign" their election verification activities.  *Id.* at ¶ 73.  According to Plaintiffs, Defendants'

---

[3] Defendants point out that NYCA, an organization, is not eligible to vote.  *See* Dkt. No. 15-1 at 12.  Plaintiffs do not contest that point.

16

conduct amounts to voter intimidation. *See id.* at ¶ 90. Defendants argue that Plaintiffs' right to vote is "not implicated at all[,]" and "Plaintiffs fail to plausibly allege that any action by Defendants was for the purpose of interfering with Plaintiffs' right to vote." Dkt. No. 15-1 at 10-11. In opposition, Plaintiffs argue that their actions described in the complaint fall within the purview of the right to vote. *See* Dkt. No. 18 at ¶ 36.

Courts in this Circuit have concluded that 52 U.S.C. § 10101 does not support a private right of action. *See, e.g.*, *Jimenez v. Junius Real Est.*, No. 16-CV-7483, 2017 WL 9534737, *5 (S.D.N.Y. June 7, 2017), *R. & R. adopted*, 2017 WL 3085345 (S.D.N.Y. July 20, 2017); *Hayden v. Pataki*, No. 00-CV-8586, 2004 WL 1335921, *5 (S.D.N.Y. June 14, 2004). Moreover, the Court could not locate any authority—and Plaintiffs have cited none—suggesting that Plaintiffs' conduct discussed in the complaint is encompassed by the statutory definition of "vote."[4] Accordingly, Defendants' motion is granted as to claim three.

**E.    Defamation Claim (Claim Four)**

Claim four accuses Defendants of defaming NYCA through their public letters and press releases. *See* Dkt. No. 1 at ¶ 92. Defendants argue that the claim is untimely and must be dismissed. *See* Dkt. No. 15-1 at 17. Apparently contradicting the complaint, Plaintiffs argue that because the AG's Office's investigation "is ongoing as far as [P]laintiffs are aware, . . . the statute

---

[4] Section 10101(b) states in relevant part, "No person, whether acting under color of law or otherwise, shall intimidate, threaten, coerce, or attempt to intimidate, threaten, or coerce any other person for the purpose of interfering with the right of such other person to vote . . . ." 52 U.S.C. § 10101(b). The statute defines "vote" to mean "all action necessary to make a vote effective including, but not limited to, registration or other action required by State law prerequisite to voting, casting a ballot, and having such ballot counted and included in the appropriate totals of votes cast[.]" *Id.* § 10101(e).

of limitations should be tolled." [5]  Dkt. No. 18 at ¶ 9.  They also assert that Plaintiff Hornik "continues to be attacked in the press over the issue[.]"  *Id.*

Defamation claims are subject to a one-year statute of limitations under New York law. *See Calenzo v. Waste Mgmt., Inc.*, No. 1:24-CV-1499, 2025 WL 2700243, *13 (N.D.N.Y. Aug. 26, 2025), *R. & R. adopted*, 2025 WL 2693776 (N.D.N.Y. Sept. 22, 2025) (citing N.Y. C.P.L.R. § 215(3)).  The claim accrues "on the date of the first publication."  *Id.* (citation and internal quotation marks omitted); *see Lehman v. Discovery Commc'ns, Inc.*, 332 F. Supp. 2d 534, 537 (E.D.N.Y. 2004).  Here, the latest of the allegedly defamatory communications was the BOE letter dated November 28, 2023.  *See* Dkt. No. 1 at ¶¶ 59, 93.  Thus, the limitations period ran on November 28, 2024, nearly a year before Plaintiffs filed their complaint on October 16, 2025.

Plaintiffs predicate their single-sentence tolling argument on their belief that the AG's Office's investigation remains ongoing.  This argument fails to address the date-of-publication accrual rule.  Moreover, the complaint alleges no facts showing that Plaintiffs could not have sued for defamation within the one-year period, whether due to the investigation or any other reason. *See Calenzo*, 2025 WL 2700243, at *13; *see also Abbas v. Dixon*, 480 F.3d 636, 642 (2d Cir. 2007).  The Court also declines to consider any press coverage of Plaintiff Hornik that is not alleged in the complaint.  *See Bristol v. Town of Camden*, 669 F. Supp. 3d 135, 155 (N.D.N.Y. 2023).

Accordingly, Defendants' motion is granted as to claim four.

**F.      Due Process Claims (Claims Five and Six)**

---

[5] In the complaint, Plaintiffs allege that the investigation "actively continued" for eleven months. Dkt. No. 1 at ¶ 65.

Plaintiffs make two due process claims: one under the Fifth Amendment and another under the Fourteenth Amendment. *See* Dkt. No. 1 at ¶¶ 95-105. Defendants' motion construes claim five as a substantive due process claim and claim six as a procedural due process claim. *See* Dkt. No. 15-1 at 13-15. Plaintiffs do not contest those characterizations. *See* Dkt. No. 18 at ¶¶ 42-58. The Court will analyze the claims accordingly.

### 1. *Substantive Due Process*

Claim five alleges that Defendants violated substantive due process by "trampl[ing]" Plaintiffs' First Amendment free speech and petition rights. Dkt. No. 1 at ¶¶ 96-97. Defendants argue that the claim is duplicative of the First Amendment claims and should be dismissed. *See* Dkt. No. 15-1 at 14-15. They also contend that "Plaintiffs fail to allege conduct rising to the level necessary to support a substantive due process violation." *Id.* at 15. In opposition, Plaintiffs argue that Defendants' conduct was conscience-shocking—and therefore satisfies the severity standard for a substantive due process claim—because it violated their First Amendment rights. *See* Dkt. No. 18 at ¶ 53.

To survive a motion to dismiss a substantive due process claim, a plaintiff "must allege governmental conduct that 'is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'" *Velez v. Levy*, 401 F.3d 75, 93 (2d Cir. 2005) (*Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998)). However, Defendants are correct that, "where another provision of the Constitution 'provides an explicit textual source of constitutional protection,' a court must assess a plaintiff's claims under that explicit provision and 'not the more generalized notion of "substantive due process."'" *Conn v. Gabbert*, 526 U.S. 286, 293 (1999) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)); *see* Dkt. No. 15-1 at 14; *see also Velez*, 401 F.3d at 94 (affirming dismissal of a substantive due process claim because the conduct underlying that

19

claim independently supported a First Amendment claim); *20 Dogwood LLC v. Vill. of Roslyn Harbor*, No. 23-930, 2024 WL 1597642, *1-2 (2d Cir. Apr. 12, 2024) (summary order) (affirming dismissal of a substantive due process claim because it was subsumed by other constitutional provisions, and stating that "dismissal of those more specific claims does not open the door to a substantive due process claim based on [the same] allegations").

When the allegations that "would serve to raise [Defendants'] actions beyond the wrongful to the unconscionable and shocking are facts which, if proven, would constitute, in themselves, specific constitutional violations[,]" dismissal is appropriate. *Velez*, 401 F.3d at 94; *see Hu v. City of New York*, 927 F.3d 81, 104 (2d Cir. 2019). Here, the Fourteenth Amendment due process claim is predicated on the same facts underlying the First Amendment free speech and petition claims. *See* Dkt. No. 1 at ¶¶ 96-97. Accordingly, the Court dismisses the substantive due process claim as duplicative of the First Amendment claims.

Defendants' motion is granted as to claim five.

### 2. *Procedural Due Process*

Claim six alleges that Defendants violated Plaintiffs' procedural due process rights by failing to review NYCA's studies, act on the studies' findings, or respond to NYCA's outreach. *See* Dkt. No. 1 at ¶¶ 101, 103-04. Defendants argue for dismissal of this claim because the Constitution does not obligate them to acknowledge Plaintiffs' outreach or respond in a certain way. *See* Dkt. No. 15-1 at 13-14. In opposition,[6] Plaintiffs argue that Defendants' lack of

---

[6] Plaintiffs' opposition papers discuss, for the first time, a "stigma plus" claim. Dkt. No. 18 at ¶ 48. This type of claim "involves an 'injury to one's reputation (the stigma) coupled with the deprivation of some 'tangible interest' or property right (the plus), without adequate process." *Segal v. City of New York*, 459 F.3d 207, 212 (2d Cir. 2006) (quoting *DiBlasio v. Novello*, 344 F.3d 292, 302 (2d Cir. 2003)). Because this claim is not enumerated in the counseled complaint, the Court declines to consider it. *See* Dkt. No. 20 at 3; *see also Conyers v. United Bhd. of Carpenters & Joiners of Am. Loc. Union*, No. 1:25-CV-1500, 2026 WL 1960842, *11 n.6

response "resulted in deprivation of multiple liberty interests[,]" including "[t]he right to choose representatives in elections restricted to legally qualified voters, . . . [t]he right to vote free from intimidation[,] . . . [t]he right to question government without retaliation[,] . . . [t]he right to petition the government for redress of grievance without retaliation[,] and [t]he right to republican government." Dkt. No. 18 at ¶ 43. According to Plaintiffs, because "a fundamental liberty interest was impaired[,] . . . process was required—e.g., notice, review, or a hearing before announcing that NYCA's claims were 'unequivocally false,' interfering with Plaintiffs' sacrosanct representative relationships, or seeking statewide media recognition of their defamatory campaign painting NYCA as conspiracy advocates and racist, anti-election radicals[.]" *Id.* at ¶ 47.

There are two elements to a procedural due process claim: (1) "'deprivation by state action of a protected interest in life, liberty, or property'"; and (2) "'inadequate state process.'" *Thomas v. Town of Lloyd*, 711 F. Supp. 3d 122, 136 (N.D.N.Y. 2024) (quoting *Reed v. Goertz*, 598 U.S. 230, 236 (2023)). The claim "'is not complete when the deprivation occurs[;] rather, the claim is complete only when the State fails to provide due process.'" *Id.* (quoting *Reed*, 598 U.S. at 236).

Importantly, however, "the First Amendment guarantees the people's right to *petition* their government: not to petition *successfully*." *Reardon v. Keating*, 980 F. Supp. 2d 302, 313 (D. Conn. 2013); *see Kittay v. Giuliani*, 112 F. Supp. 2d 342, 354 (S.D.N.Y. 2000), *aff'd*, 252 F.3d 645 (2d Cir. 2001) (stating that the right to petition does not "ensure that an elected official will necessarily act a certain way or respond in a certain manner to requests from his constituents"). Therefore, while Plaintiffs had a protected liberty interest in the right to petition Defendants, there was no obligation on Defendants to respond a certain way or at all. *See Schulz v. New York*, No.

---

(N.D.N.Y. June 30, 2026) ("It is not appropriate to modify existing claims or add new claims through motion practice").

1:19-CV-56, 2019 WL 3975670, *6-7 (N.D.N.Y. Aug. 22, 2019); *Futia v. United States*, No. 22-CV-6965, 2023 WL 3061903, *6 (S.D.N.Y. Apr. 24, 2023); *We the People Found., Inc. v. United States*, 485 F.3d 140, 141 (D.C. Cir. 2007), *cert. denied*, 552 U.S. 1102 (2008) (citing *Minn. State Bd. for Cmty. Colls. v. Knight*, 465 U.S. 271, 283, 285 (1984); *Smith v. Ark. State Highway Emps., Loc. 1315*, 441 U.S. 463, 465 (1979)).  It follows that Defendants' failure to acknowledge or act on Plaintiffs' petition and studies was not a denial of due process.  *See Schulz*, 2019 WL 3975670, at *6-7 (finding no constitutional violation where the State of New York and various state actors did not respond to the plaintiffs' petitions).

Defendants' motion is granted as to claim six.

**G.    Composition Clause Claim (Claim Seven)**

Claim seven alleges that Defendants violated the Composition Clause (also called the Qualifications Clause in some courts) by "consistently and deliberately act[ing] to ignore, deny, refute, attack, and criminally investigate evidence indicating that" New York's voting systems do not comply with Article I of the Constitution.  Dkt. No. 1 at ¶ 111.  Defendants argue that the claim must fail because Plaintiffs "admit that they cannot prove any interference with" the right to vote.  Dkt. No. 15-1 at 16.  Plaintiffs reject that argument because "[t]he plain fact that neither Defendants, nor any other honest observer of these reports and proceedings, have any idea who legally won any election in New York in 2020, 2022, and 2024, violates the right of the people to choose."  Dkt. No. 18 at ¶ 62.

The Composition Clause states, "The House of Representatives shall be composed of Members chosen every second Year by the People of the several States, and the Electors in each State shall have the Qualifications requisite for Electors of the most numerous Branch of the State Legislature."  U.S. CONST. art. I, § 2, cl. 1.  The Supreme Court has held that, "construed in its

22

historical context, the command of [the Composition Clause], that Representatives be chosen 'by the People of the several States' means that as nearly as is practicable one man's vote in a congressional election is to be worth as much as another's." *Wesberry v. Sanders*, 376 U.S. 1, 7-8 (1964).  In other words, Article I "gives persons qualified to vote a constitutional right to vote and to have their votes counted." *Id.* at 17 (citing *United States v. Mosely*, 238 U.S. 383 (1915)).

Plaintiffs appear to base their Composition Clause claim on allegations that their audits revealed possible voter roll discrepancies, and Defendants failed to act on those reports.  *See* Dkt. No. 1 at ¶¶ 111-12.  They assert that "Defendants abused the public's trust and national sovereignty when they rejected the possibility that citizen watchdogs had uncovered a national security breach of the systems Defendants are charged with custody over."  *Id.* at ¶ 111.  Based on the text of the complaint, the Composition Clause claim challenges Defendants' failure to take any steps toward fixing purported problems with New York's election systems.  *See id.*

Plaintiffs cite no authority where the Composition Clause was construed to protect the right to audit election systems or processes.  *Cf. Isabel v. Regan*, 394 F. Supp. 3d 966, 970-71, 981-83 (D. Ariz. 2019), *aff'd*, 987 F.3d 1220 (9th Cir. 2021) (considering the merits of a § 1983 claim under the Composition Clause where the plaintiff alleged his ballot was not counted).  "The best reading of the [Composition] Clause is that it simply ensures that a voter who is qualified to vote in an election for the most numerous branch of the state legislature . . . must also be permitted to vote for candidates for the United States House of Representatives." *See id.* at 981; *see also Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 229 (1986) ("The fundamental purpose of the . . . Clauses contained in Article I, § 2 . . .  is satisfied if all those qualified to participate in the selection of members of the more numerous branch of the state legislature are also qualified to participate in the election of Senators and Members of the House of

23

Representatives"); *United States v. Classic*, 313 U.S. 299, 315 (1941) ("Obviously included within the right to choose, secured by the Constitution, is the right of qualified voters within a state to cast their ballots and have them counted at Congressional elections").

Plaintiffs are not required to produce evidence or prove that the election results were inaccurate at the pleading stage. However, Plaintiffs do not allege that Defendants actually interfered with their ability to vote in a congressional election, such as by miscounting their votes or preventing them from casting a ballot or registering to vote. As a result, the complaint does not claim Defendants' actual interference with Plaintiffs' rights contemplated in the Composition Clause. *See* Dkt. No. 1 at ¶¶ 21, 111. To the extent that Plaintiffs claim the 2020 and 2022 elections *might* not have complied with the Composition Clause, claim seven fails because Plaintiffs have the burden of pleading "a right to relief above the speculative level[.]" *Twombly*, 550 U.S. at 555.

Defendants' motion is granted as to claim seven.

## H.    "Remediation of Uncontested Claims"

In a section of the complaint labeled "Remediation of Uncontested Claims," Plaintiffs assert that Defendants do not contest certain findings from NYCA's studies. *See* Dkt. No. 1 at ¶¶ 113-18. The Court has reviewed these allegations and concludes that they do not articulate any additional cognizable legal claims.

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions, and the applicable law, and for the reasons set forth above, the Court hereby

**ORDERS** that Defendants' motion to dismiss (Dkt. No. 15) is **GRANTED in part and DENIED in part**; and the Court further

24

**ORDERS** that Plaintiffs' claims for declaratory and injunctive relief are **DISMISSED without prejudice for lack of jurisdiction**; and the Court further

**ORDERS** that claims one, two, four, five, six, and seven, as asserted against Defendants in their official capacities, are **DISMISSED without prejudice for lack of jurisdiction**; and the Court further

**ORDERS** that claims four, five, six, and seven, as asserted against Defendants in their individual capacities, are **DISMISSED with prejudice**; and the Court further

**ORDERS** that claim three, as asserted against Defendants in both their official and individual capacities, is **DISMISSED with prejudice**; and the Court further

**ORDERS** that claims one and two, as asserted against Defendants in their individual capacities, shall proceed, and Defendants shall file an answer thereto; and the Court further

**ORDERS** that Defendants BOE and Berger are **DISMISSED** from this action, as only individual-capacity claims remain; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated:  August 7, 2026
        Albany, New York

Mae A. D'Agostino
U.S. District Judge